### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CIVIL ACTION NO. 1:14cv520 (WOB)

MARY ELLEN HINSON,                                      PLAINTIFF

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

UNIVERSITY OF CINCINNATI,
HOXWORTH BLOOD CENTER et al.,                          DEFENDANT

This matter is before the Court on defendant's motion for summary judgment (Doc. 16).

The Court heard oral argument on this motion on Wednesday, October 28, 2015. Mark J. Byrne represented the plaintiff. Wendy K. Clay and Richard N. Coglianese represented the defendant. Court reporter MaryAnn Ranz recorded the proceedings.

Having heard from the parties, the Court now issues the following Memorandum Opinion and Order.

#### *Factual and Procedural Background*

Plaintiff, Mary Ellen Hinson, worked as a "donor specialist" for Defendant, University of Cincinnati, Hoxworth Blood Center (UC), from 1997 to early 2013 when UC terminated her employment. (Doc. 15, pp. 13:11–14:19.) Donor specialists draw blood and screen donors for eligibility.[1] (*Id.* at 26:11–27:5.) Hinson described a typical UC blood-draw site as follows.

---

[1] Hinson also regularly operated automated machines that draw red blood cells, platelets, or plasma. (Doc. 15, p. 14:1–13.) She worked in one location three to four days a week running the automated machines and rotated to other blood-draw locations the rest of the week.

Donors arrive and register. A UC employee gives the donors a form to complete with questions pertaining to health matters that may disqualify a person from donating. Interspersed throughout the form are a number of "attention questions" designed to ensure donors carefully read the form and answer each question deliberately. (*Id.* at 36:16-37:20; Doc. 15-1, pp. 20, 45; Doc. 16-1, p. 3, ¶ 8.) For example, Question 50 asks: "Female Donors Only: Have you ever been pregnant? If yes, How many times?" (Doc. 15-1, p. 122.) If a male donor answers "yes" or "no," this error suggests the donor is not thoroughly reading the questions. (*See* Doc. 15, pp. 36:22-37:20.) Upon completion of the form, a UC employee calls the donor to a screening room to check the donor's vital signs and review the form to determine whether the donor is eligible. (*Id.* at 25:8-22, 34:6-22.) If the screener does not discover any disqualifying information, she sends the donor to another area to have his blood drawn. (*See id.* at 25:21-26:7.)

UC issues "standard operating procedures"[2] (SOPs) that explain expected employee conduct with respect to donor screening. (*See* Doc. 15-1, pp. 61-93; Doc. 16-1, p. 2, ¶ 6.) The "Donor Selection" SOP requires that, "[i]f any of these attention questions are answered inappropriately, the screener will ask the donor <u>all</u> of the questions on the donor form."

---

[2] The parties use this term synonymously with "standards of protocol."

(Doc. 15-1, pp. 64-65 (underline in original).) Hinson admits she knew and understood this SOP at the time of the incident in this case. (Doc. 21, p. 2, ¶¶ 10-12.) In response to reports of employees deliberately deviating from SOP on screening and drawing blood, UC distributed an October 2012 memorandum reminding employees of the SOP. (Doc. 15-1, pp. 20-21; Doc. 16-1, pp. 2-3, ¶ 7.) The same month, Hinson attended training that identified the incorrect handling of missed attention questions as one of the most common errors in the blood-draw process. (Doc. 15, pp. 38:14-39:8; Doc. 15-1, pp. 23, 38.)

The incident triggering Hinson's termination concerned her screening a donor on January 30, 2013. (Doc. 15, pp. 49:9-12, 76:3-7; Doc. 15-1, p. 44.) That day, Hinson was screening donors with UC employee, Aaron Strange. (Doc. 15, pp. 49:13-50:4.) An employee named Brian Wilson was drawing blood. Strange initially screened the donor in question. (*Id.* at 50:5-15.) When Wilson noticed the donor missed one of the attention questions, he took the donor back to be rescreened. (*Id.* at 50:17-19.) Hinson initially told Wilson to have Strange rescreen the donor since Strange's initials were on the form. (*Id.* at 50:20-51:11, 52:6-53:15.) However, because Strange was already screening another donor, Wilson had donors ready to draw, and Hinson had not yet

started another screening, Hinson agreed to rescreen the donor.[3] (*Id.* at 51:3–52:4, 53:16–18.)

Hinson testified to the following account of how she rescreened the donor and the comments she made to him during the rescreen. The donor was upset about the amount of time his donation was taking. (*Id.* at 51:22–52:1, 53:22–54:1, 72:21–73:7.) Hinson tried to be friendly to the donor and joked with him about the process taking so long even though he only missed one question. She told the donor they still had to go through all the questions because that was the policy. (*Id.* at 54:2–8.) She corrected the missed attention question and then asked the donor all questions on the form. She did not read each question verbatim and admits she paraphrased and consolidated some questions. (*Id.* at 56:3–57:1, 63:17–64:1.) She went through the questions very quickly, but one at a time and allowing the donor time to answer each question with quick "um-hmm" answers. (*Id.* at 70:10–71:7.)

She joked with the donor that Wilson was outside timing them because he is so impatient and that he "is a real stickler

---

[3] Hinson stresses that UC policy or practice required Strange to rescreen the donor since he was the initial screener and had already signed his initials on the form. (Doc. 21, p. 3, ¶¶ 16–18; Doc. 15, pp. 50:7–53:15.) However, Hinson could not identify an SOP requiring this practice, and she admitted she may have simply remembered that she learned in nursing school not to add information to a form already signed by another person. (*Id.; see also* Doc. 15-1, p. 38 (UC training materials suggesting UC allowed employees to add information to an already-signed form as long as the employee adding the information initialed and dated the change).) Even if Hinson is correct as to what UC policy required in this situation, when she voluntarily agreed to rescreen the donor, she was responsible to do so in compliance with SOP.

for all this, so when you go out there, just tell him we went through this really fast." (*Id.* at 54:13–55:7, 71:15–72:20.) Hinson assumed the donor knew she was joking, but she admitted that she did not know this for sure. (*Id.* at 74:6–22.) Hinson could not recall what else she may have said to the donor, but she did not recall saying anything akin to "tell them I asked you all 50 questions if someone asks you." (*Id.* at 73:14–74:5.) The rescreen took five to seven minutes.[4] (*Id.* at 57:2–5, 70:1–7.) During her deposition, counsel asked Hinson one-by-one whether she asked the donor in this case each question on the form. In each instance, she answered that she had and, for certain questions, she explained how she asked them. (*Id.* at 57:9–70:24.) Later during her deposition, Hinson went through the entire form and asked each question as she typically asked them to donors.[5] (*Id.* at 107:23–113:24.)

Wilson did not believe Hinson took enough time to properly rescreen the donor. When Wilson asked, the donor informed him that Hinson had not asked all the questions. The donor also stated that Hinson instructed him to report that she had read all the questions if anyone asked. (Doc. 16-1, p. 6.) Wilson

---

[4] The only evidence in the record as to how long a proper screening typically lasts comes from a letter denying Hinson's grievance with UC. (Doc. 15-1, pp. 94–95.) It states that asking all the questions on the form "normally takes fifteen to twenty minutes." (*Id.* at 94.)
[5] Specific examples of how Hinson asks the questions will be discussed below.

drew the donor's blood then reported the incident to management.[6] (*See* Doc. 15-1, pp. 47, 105–06.) Management contacted the donor, who reported that Hinson had bypassed some of the questions and instructed the donor not to tell anyone. (Doc. 16-1, p. 6; Doc. 15-1, p. 94.)

Shawn Gregory was director of donor services when the events in question occurred, and he was involved in determining the appropriate discipline for each employee. (Doc. 15, pp. 17:6–16; Doc. 16-1, pp. 1, 4–5, ¶¶ 2, 15–18.) Gregory swore by affidavit that Hinson admitted to him during his investigation of the incident that she consolidated some of the questions while rescreening the donor in this case. (Doc. 16-1, pp. 3–4, ¶ 11.) She further admitted that she had consolidated the questions in the same manner for years. (*Id.*) Gregory swore that Hinson gave him examples of the way she consolidated questions, and the examples concerned him because she was not asking the questions as they were phrased on the form. (*Id.*) Hinson testified that she was called to the management office one day shortly after the incident and was told that she was being terminated. (Doc. 15, pp. 77:18–79:7.) Hinson received a notice

---

[6] The record does not clearly reveal when in the blood-draw process Wilson discovered Hinson had not asked all the questions. (*See* Doc. 16-1, p. 6 (email from donor stating that Wilson asked about the questions "while [the donor was] in the chair"); Doc. 16, p. 11 (UC's brief stating that "Wilson *continued* to draw" after the discovery) (emphasis added); Doc. 15-1, pp. 46–47 (Hinson's letter of termination stating that by the time the donor reported the failure to ask all questions, "[Wilson] had already drawn the donor['s] blood, which then had to be quarantined").)

(dated 02/04/2013) informing her she was immediately placed on administrative leave pending a hearing to consider charges that she violated several specified SOPs, including the donor selection SOP. (Doc. 15-1, p. 43; Doc. 15, pp. 77:18-78:23.)

UC held the administrative hearing on February 21, 2013, and the hearing officer informed Hinson of the outcome by letter dated February 27, 2013. (Doc. 15-1, pp. 46-47; Doc. 15, pp. 79:8-80:22.) The letter stated that management sought Hinson's termination. (Doc. 15-1, pp. 46-47.) The officer concluded that termination was warranted for two reasons: (1) Hinson admitted she "consolidated or grouped some of the questions asked of the donor," which violates SOP; and (2) both Wilson and the donor reported that Hinson instructed the donor to say Hinson did "go through each and every question." (*Id.; see also* Doc. 16-1, pp. 4-5, ¶¶ 14, 18.) The letter further provided that because management believed Hinson routinely failed to ask all questions on the form, UC was forced to audit what it estimated to be 7,000 past donations screened by Hinson. (Doc. 15-1, pp. 46-47; Doc. 16-1, pp. 3-4, ¶ 11.) A decision letter on Hinson's claim of harassment against Wilson stated Hinson had been terminated due to (1) her conduct on the date of the incident, and (2) "her work behavior that came out in the hearing." (Doc. 15-1, pp. 104-05.)

For their roles in the January 30 events, Strange was not

formally disciplined, and Wilson was issued a written warning. (Doc. 16-1, pp. 4-5, ¶¶ 15-18.) UC hired a woman to fill Hinson's vacant position. (*Id.* at 5, ¶ 19.)

Following her termination, Hinson brought this Title VII action, alleging that UC's decision to terminate her employment was based on her gender.[7] (Doc. 1.) UC subsequently moved for summary judgment. (Doc. 16.)

### *Analysis*

Hinson does not claim to have direct evidence of discrimination. Therefore, to survive summary judgment, she must first establish a prima facie case that she (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was treated differently from similarly situated, non-protected employees. *Shazor v. Prof'l Mgmt.*, 744 F.3d 948, 957 (6th Cir. 2014); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The burden then shifts to UC to proffer a legitimate, non-discriminatory reason for termination. *Shazor*, 744 F.3d at 957. If UC is able to offer such a justification, the burden shifts again for Hinson to show by a preponderance of the evidence that the proffered reason was merely a pretext for intentional

---

[7] In addition to the Title VII claim, Hinson initially brought an age discrimination claim and a state law gender discrimination claim. (Doc. 1, pp. 3-5.) She voluntarily agreed to dismiss these two additional claims in December 2014. (Docs. 6-8.)

discrimination. *Id.* To overcome a motion for summary judgment a "plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Id.* The ultimate burden of proving the employer's intent to discriminate remains at all times with the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

**A. Hinson has failed to establish her prima facie case of gender discrimination because she has not shown similarly situated male employees were treated more favorably.**

Hinson claims that she is a woman, (Doc. 1, p. 2, ¶ 7), that UC terminated her employment, (*id.* at ¶ 10), and that she was qualified for her donor services position, (*id.* at ¶¶ 9, 11). UC does not contest these facts. Therefore, the only prima facie element at issue is whether Hinson was treated less favorably than similarly situated male employees. Hinson identifies Strange and Wilson as comparators, arguing that they were similarly situated to her because they were subject to the same SOPs and violated the same SOP Hinson allegedly violated. (*Id.* at ¶ 13; Doc. 15-1, p. 14, ¶ 6; Doc. 15, pp. 124:14–126:7.) UC argues that Strange's and Wilson's conduct was less serious, and therefore, they were not similarly situated to Hinson. *An examination of the record reveals that Hinson's conduct leading to her termination was significantly more serious than her coworkers' conduct because she routinely committed the same*

*violation for years leading up to her termination and her violation caused more significant harm.*

Employees are "similarly situated" if similar in all *relevant* aspects of their employment situations. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). Such aspects may include whether they dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances to distinguish their conduct or the employer's treatment of them for it. *Id.* Exact correlation is not necessary. *Martin v. Toledo Cardiology Consultants*, 548 F.3d 405, 411–12 (6th Cir. 2008). In the disciplinary context, an important consideration is whether the employees engaged in conduct of "comparable seriousness." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). Even where employees' actions are superficially identical, the harm that results from each instance of conduct may contribute to whether the employees are similarly situated. *Id.* at 607–08, 611–12 (holding a plaintiff truck-driver who violated safety policy and injured an employee was not "similarly situated" to three other truck-drivers who engaged in the exact same safety violation but without causing injury).

As a threshold issue, Hinson maintains that she did not commit any violation of UC SOP. The record shows otherwise. The SOP in question requires screeners to ask all questions on the

donor form. It does not expressly require that they be read verbatim, nor does it expressly prohibit paraphrasing the questions. (Doc. 15-1, pp. 64-65.) Although Hinson admits to asking shortened, paraphrased, consolidated versions of the questions, this act does not appear to violate SOP, per se, as long as she captured the full substance of each question on the form. However, her testimony establishes that she failed to do this.

The parties' disagreement over whether Hinson asked all questions on the form appears to stem from their preoccupation with there being *fifty* questions on the form. During her deposition, counsel asked Hinson one-by-one: "did you ask question number one; did you ask question number two; et cetera." (Doc. 15, pp. 57:9-70:24.) Indeed, viewing the evidence in Hinson's favor, it appears she did ask fifty questions loosely addressing the subject matter of each question on the form. However, the SOP does not require screeners to ask *fifty* questions. In fact, the SOP provides that many of the fifty listed questions will require follow-up questions depending on the donor's initial response. (Doc. 15-1, pp. 64-91.)

For example, Question 24 asks whether the donor has obtained a tattoo in the past twelve months. (*Id.* at 122.) If the SOP required only that the screener ask all fifty questions on the form, she has fulfilled that duty regardless of how the

donor answers. However, the SOP suggests that screeners must ask as many questions as it takes to reach the full substance of each question on the form. Continuing with the above example, if a donor answers that she recently obtained a tattoo, the SOP expressly requires screeners to determine where (geographically) the donor obtained the tattoo; whether the state in which the donor obtained the tattoo is biohazard regulated; and whether the tattoo is clean, dry, and pain-free. (*Id.* at 77.)

During her deposition, counsel also asked Hinson to go through the form and ask each question in the way she posed them to donors. (Doc. 15, pp. 107:23–113:24.) In some cases, her modifications appear to sufficiently reach the substance of the counterpart question on the form. For example, there are several questions premised on the donor spending time outside the United States. (Doc. 15-1, p. 122 (#28 asks whether the donor has left the U.S. or Canada in three years; #29 asks whether the donor spent more than three months in the U.K. from 1980 through 1996; #31 asks whether the donor spent more than five years in Europe from 1980 to present; and #32 asks whether the donor received a blood transfusion in the U.K. or France from 1980 to present).) To cover these questions, Hinson appears to have asked donors broader, threshold questions, such as whether they have been outside the United States or whether they have been to the United Kingdom. (Doc. 15, pp. 63:21–66:15, 112:17–113:3.) If a

donor answers that she has never been outside the United States, Hinson's position is that she has essentially asked, and received answers to, the four questions premised on the donor's time outside the country. If the donor answered that she had been outside the United States, Hinson would ask follow-up questions until she reached the substance of those questions. (*Id.* at 65:1–19, 112:24–113:1.)

Conversely, many of Hinson's admitted modifications do not reach the substance of the counterpart question on the form. For example, Question 10 asks whether, in the past eight weeks, the donor has had contact with anyone who had a smallpox vaccination. (Doc. 15-1, p. 122.) The SOP at issue specifically provides that a donor may be disqualified if she has touched bedding or clothing of one who recently received a smallpox vaccination. (*Id.* at 71–72.) With respect to this question, Hinson simply asked: "Smallpox?" or "How about smallpox?" (Doc. 15, pp. 56:17–20, 111:4–6.)

Since donors are only rescreened when they miss a question, UC presumes they filled out the form quickly, without paying close attention. If the donor had not read Question 10 on the form, he would not realize Hinson's version was supposed to inquire whether he had come into contact with anyone who had a smallpox vaccination. Because "How about smallpox?" would not prompt the donor to disclose the full extent of contact he may

have had with anyone who recently received a smallpox vaccination, Hinson failed to ask the substance of this question.

Question 13 asks whether the donor has had an organ, tissue, or bone marrow transplant in the last twelve months. (Doc. 15-1, p. 122.) For this question, Hinson admitted she asked only whether the donor had an "organ donation" and "How about tissue grafts?" (Doc. 15, pp. 59:16–22, 111:21–22.) Hinson's version is deficient to fulfill her duty to ask all questions because it fails to inquire about bone marrow transplants, which permanently disqualify a donor according to SOP. (Doc. 15-1, p. 73.)

Question 14 asks whether the donor has had a bone or skin graft in the last twelve months. Hinson asked whether the donor had a "bone graft" or "Any new bones?" (Doc. 15, pp. 59:16–24, 111:21–22.) But Hinson failed to ask about skin grafts, which disqualify a donor for twelve months. (Doc. 15-1, p. 73.)

Question 15 asks whether the donor came into contact with anyone's blood within the past twelve months. Hinson asked only: "Anybody give you blood lately?" (Doc. 15, p. 111:21–24.) Hinson's version would likely cause the donor to answer "yes" if he had received a blood transfusion, but would not cause him to answer "yes" if he had simply come into contact with anyone's blood under other circumstances, which may disqualify a donor

14

for twelve months. (Doc. 15-1, p. 73.)

Question 17 asks whether, in the past twelve months, the donor had sexual contact with anyone who has HIV/AIDS or a positive HIV/AIDS test; 18 asks whether the donor had sexual contact with a prostitute; 34 asks whether male donors ever had sexual contact with another male. "Yes" responses to any of these questions result in either twelve-month or permanent disqualification. (*Id.* at 74, 85.) Hinson testified that, in an effort to not offend donors, to cover these questions she asks: "Any sexual content [sic] with anybody on the corner? Anything like that? . . . So, Have you been on the corner and been with anybody other than your wife?"[8] (Doc. 15, pp. 111:24–112:13.) Again, Hinson's version superficially addresses the broad subject matter of the form questions but fails to reach the required specific information.

Question 42 asks whether the donor has ever "[r]eceived a dura mater (or brain covering) graft."[9] UC's SOP requires permanent disqualification of a donor who has received a dura mater graft during either brain or spinal cord surgery. (Doc. 15-1, p. 87.) Hinson's version of the question asks: "You

---

[8] Hinson initially testified that Question 34 may have been the attention question the donor in this case missed, so she may have re-asked that question first when the donor came to be rescreened. (Doc. 15, pp. 66:20–67:3.) It is unclear from the donor's form in the record what question he missed. (*See* Doc. 15-1, pp. 121–22.) There does not appear to be any writing crossed out or notes with respect to Question 34. (*Id.*)

[9] "Dura mater" is a membrane that provides a protective covering to the brain and spinal cord.

haven't had a brain transplant lately, have you?" or simply: "Brain transplants?" (Doc. 15, pp. 68:9-11, 113:13.) One who knew he received a dura mater graft during spinal cord surgery would not know to answer "yes" to this question based on Hinson's inquiry as to "brain transplants." Therefore, she has failed to ask the question.

These few questions are only a sampling of how Hinson's modifications missed much of the substance of the questions on the form. Although she appears to have asked fifty questions, broadly addressing the subject matter of each of the numbered questions on the form, that is not what the SOP requires. It requires that the screener ask all questions on the form, meaning she must solicit answers as to every health-history item addressed on the form. Even accepting as true all Hinson's testimony regarding how she asked the questions, she has failed to show she can genuinely dispute the fact that she violated SOP by not asking _all_ questions on the form.

Hinson cannot show her violation of SOP was of comparable seriousness to either Strange's or Wilson's conduct. Management viewed Strange's conduct as mere oversight, not deserving formal discipline. Hinson acknowledges in her brief that Strange did not notice the donor missed a question. (Doc. 21, p. 3, ¶ 15.) UC safeguards against such oversight by requiring the employees drawing blood to double-check that the form was accurately

completed. And that is how Strange's mistake was caught here. Although Strange arguably violated the same SOP as Hinson by failing to ask all questions on the form to a donor who missed an attention question, it is reasonable for UC to tolerate a violation caused by human error and oversight while refusing to tolerate the same violation caused by an employee performing her duties in an unacceptable manner. Additionally, because UC's safeguard caught Strange's oversight, no harm directly resulted from his conduct. The donor was able to be rescreened before donating.

As to Wilson's conduct, while he continued to draw the donor's blood after discovering Hinson had not asked all the questions, mitigating circumstances differentiate the level of his misconduct. Wilson reported the incident to management within a short time. This remedial action both (1) showed Wilson was not trying to conceal his part in the incident; and (2) allowed management to contact the donor by phone, ask all questions on the form, and ensure he was qualified to donate. By reporting the incident quickly, Wilson prevented the donor's blood from being disqualified and prevented any harm that may have otherwise resulted.

Conversely, Hinson did not voluntarily report her conduct of modifying questions, and significant harm resulted. During the investigation into Hinson's conduct, she admitted to

management that she modified the questions with the donor in this case and that she had modified the questions in the same manner for years. When Hinson gave management examples, her questions so significantly deviated from those on the form that management found it necessary to audit approximately 7,000 past blood donations screened by Hinson. Hinson has not offered evidence to show this audit was not actually conducted, was unnecessary, or was a ruse to conceal the true reason for her termination.

Hinson has not provided evidence that Strange's or Wilson's violations were any more than one-time errors that resulted in no harm to UC. Hinson's conduct was significantly more serious. She admitted she routinely modified the questions for years, and she has not disputed that this violation caused significant harm to UC in the form of an extensive audit. Therefore, Hinson has failed to show she was similarly situated to either Strange or Wilson.[10]

---

[10] UC also argues that Hinson's conduct is distinguishable from that of her coworkers because Hinson tried to conceal her violation. However, UC relies primarily on inadmissible hearsay for this point. *See Shazor*, 744 F.3d at 959-60. UC offers the donor's statement concerning what Hinson stated to him. The donor purportedly stated to Wilson, Gregory, and others that Hinson instructed him to conceal her failure to ask all the questions. UC uses the donor's statement to show the truth of the matter asserted therein--that Hinson made the statement to the donor. Although Hinson's purported statements to the donor are otherwise admissible under Federal Rule of Evidence 801(d)(2)(A), because UC offers Hinson's statement through the statement of the donor there must also be a rule allowing the donor's statement. *See* Fed. R. Evid. 805. Since there is not a rule excluding the donor's statement from the definition of hearsay or excepting it from the rule against hearsay, this Court will not consider the donor's statement for its truth. However, even without the donor's statement Hinson has failed to

Because Hinson cannot show she was treated less favorably than similarly situated male employees, she has failed to establish her prima facie case.

**B.  UC proffers a legitimate, non-discriminatory reason for Hinson's termination, and Hinson cannot show the proffered reason to be pretextual.**

Even assuming, arguendo, that Hinson could establish a prima facie case, UC argues Hinson's termination was warranted because she: (1) violated UC policy in the way she modified the questions with the donor at issue; (2) had been modifying the questions in the same manner for years, which caused the need for an extensive audit, and (3) attempted to conceal the violation. (Doc. 16, pp. 21-22; Doc. 16-1, pp. 3-5, ¶¶ 11-14, 18.)

Because UC has offered a legitimate, non-discriminatory reason for Hinson's termination, Hinson may establish pretext only by showing: (1) there was *no basis in fact* to support UC's proffered reason, (2) the proffered reason was not the *actual* reason, or (3) the proffered reason was *insufficient* to motivate the termination. *Shazor*, 744 F.3d at 959. At the summary judgment stage, a plaintiff need only show "genuine disputes of fact regarding the legitimacy of the defendant's stated reasons." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 240 (6th Cir. 2015). Hinson's briefing argues only the first method above.

---

establish the fourth element of her prima facie case.

19

(Doc. 21, pp. 18–19; *see also* Doc. 22, pp. 7–8.) Likewise, she did not raise the second or third methods in oral argument on this motion.

Under the first method, a plaintiff may establish pretext by showing there is a genuine dispute as to whether the facts purportedly motivating the termination ever existed. *Shazor*, 744 F.3d at 959. But even where a plaintiff shows a genuine dispute as to the existence of facts underlying the proffered reason, the defendants may still be entitled to summary judgment under the "honest belief doctrine." *Id.* at 960. Where the employer can show it honestly believed in its reason, "and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision," the proffered reason is not pretextual even if the underlying facts are subsequently disproven. *Id.; Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285–86 (6th Cir. 2012). Once the defendant sufficiently shows an honest belief, the plaintiff has the burden to prove the belief was not honestly held. *Seeger*, 681 F.3d at 285.

Hinson argues UC's proffered reason had no basis in fact because: (1) she did not violate SOP, (2) management could not have honestly believed she violated SOP because no SOP prohibits paraphrasing the questions, and (3) she did not attempt to conceal a violation. As explained above, Hinson's testimony establishes that she violated SOP. As to the honest belief

doctrine, Gregory swore he honestly believed in the proffered reason for termination. He swore that Hinson admitted to modifying the questions both with the donor in question and for years before then. He swore Hinson gave him examples of her modifications, which deviated from the questions on the form so significantly that management found it necessary to perform an extensive audit of Hinson's past screenings. At an administrative hearing, Hinson again admitted to modifying the questions.

The donor's statement was also discussed at the administrative hearing, showing that management was aware of the statement at the time it terminated Hinson.[11] The donor had stated that Hinson did not ask all the questions on the form and had instructed the donor to report that she had. The fact that management knew of the donor's statement further evidences that it honestly believed Hinson had not asked all the questions and attempted to conceal her violation.[12] Given the information before it at the time, management made a reasonably informed and considered decision that termination was warranted. Therefore, the honest belief doctrine saves the termination from being

---

[11] Gregory also swore that he knew of the donor's statement prior to the hearing, that knowledge being evidenced by an email from the donor attached to Gregory's affidavit. However, this email is dated March 29, 2013, over a month after the administrative hearing and Hinson's letter of termination. The email does not reveal *when* Gregory became aware of the donor's statement.

[12] Although this Court will not consider the donor's statement to prove Hinson made her statement, "[a] statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009).

deemed a pretext under the first method.

Even accepting all Hinson's testimony as true, she has not shown that a genuine dispute exists as to whether UC terminated her employment for a legitimate, non-discriminatory reason. Therefore, she has failed to show UC's proffered reason was a pretext for intentional discrimination.

Having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 16) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 2nd day of November, 2015.



Signed By:

_William O. Bertelsman_

United States District Judge

TIC: 10 min.